# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| IN RE RAYTHEON COMPANY<br>SECURITIES LITIGATION | : | Civil Action No. |
| | : | 99-12142-PBS |
| | : | |
| THIS DOCUMENT RELATES TO: | : | |
| ALL ACTIONS | : | |

## DECLARATION OF LEAD COUNSEL IN SUPPORT OF PROPOSED CLASS ACTION SETTLEMENTS AND PETITION FOR AN AWARD OF ATTORNEYS' FEES AND REIMBURSEMENT OF EXPENSES

Salvatore J. Graziano hereby declares:

### INTRODUCTION

1.     I am a member of the law firm Milberg Weiss Bershad & Schulman LLP, which serves as lead counsel for the New York State Common Retirement Fund ("NYSCRF") and the Class as defined below. I submit this declaration in support of (i) the proposed settlements of this litigation consisting of payments by the Raytheon Defendants[1] of a total of $410 million to the Class, including $210 million in cash and $200 million worth of Raytheon warrants, and payment by defendant PricewaterhouseCoopers LLP ("PwC") of $50 million in cash, for a total value of $460 million to the Class (the "Settlements"), and (ii) the application of plaintiff's counsel for an award of attorneys' fees and reimbursement of expenses to be paid from the Settlement Funds. My firm has actively participated in all aspects of this litigation, and I am familiar with the facts set forth in this declaration.

2.     I respectfully submit that the Court should approve the Settlements. The Settlements represent one of the ten largest recoveries ever achieved in a securities class action.

---

[1]     Defendants Raytheon Company and its officers and directors – Dennis J. Picard, Daniel P. Burnham, Peter R. D'Angelo, Franklyn A. Caine, Shay D. Assad, and William H. Swanson (the "Individual Defendants") – are collectively referred to as the "Raytheon Defendants."

Lead Plaintiff achieved the Settlements notwithstanding substantial contested issues with respect to liability and damages. The Settlements were achieved on the eve of trial after more than four years of hard-fought litigation that sharply illuminated the strengths and weaknesses of plaintiff's case. The Settlements occurred only after repeated mediations, involving arms'-length bargaining by experienced and knowledgeable counsel, with the assistance of both a sitting federal judge and a retired federal judge. The settlement negotiations benefited from the direct and active participation of the Lead Plaintiff, NYSCRF, at each meeting, including the General Counsel of NYSCRF and members of his office, and required approval by New York State Comptroller Alan G. Hevesi. NYSCRF is one of the nation's largest and most proactive institutional investors.

3.      This declaration also addresses Lead Plaintiff's proposed Plan of Allocation. The plan, which is set forth fully in the "Notice of Proposed Settlements of Class Action, Motion for Attorneys' Fees and Settlement Fairness Hearing" (the "Notice") that has been mailed to members of the Class, reflects the strengths of claims at different points throughout the Class Period, as defined below, and provides a greater share of the Settlements to those who suffered the most from defendants' alleged fraud. The Plan of Allocation has been carefully reviewed by the Lead Plaintiff and meets its approval.

4.      I also submit this declaration in support of the application by plaintiff's counsel for an award of attorneys' fees in the amount of 9% of the Settlement Funds (including interest) to be paid in cash and warrants in the same proportion as made available to Class members and reimbursement of $6,992,407.22 in litigation expenses plus interest at the same rate as accrued by the funds from the date of inception of the funds through the date of payments. Counsel for Lead Plaintiff worked on a fully contingent fee basis for over four years. Counsel shouldered the

risk of committing huge resources to the litigation and of working long hours in an intensely litigated matter, notwithstanding significant uncertainty as to whether the litigation would succeed. Lead Plaintiff's efforts have produced a result for the Class that is excellent by any measure, especially in light of the fact that the Company never restated its financial results and no formal government action was ever taken against the Company. As discussed below, the requested fee falls well within the range recognized as appropriate in federal securities class actions such as this, regardless of whether the proposed fee is evaluated as a percentage of the amount recovered or as a multiple of counsel's lodestar.

5.      For the reasons discussed below, I respectfully submit that the Settlements are worthy of immediate approval, that the proposed Plan of Allocation is equitable and just, and that the requested fee and expenses should be awarded in full. The relevant law supporting approval of the Settlements and requested fee is set forth in the accompanying Memorandum of Law in Support of Final Approval of Class Action Settlements and Plan of Allocation and Memorandum of Law in Support of Plaintiff's Counsel's Application for an Award of Attorneys' Fees and Reimbursement of Expenses.

## BACKGROUND AND HISTORY OF THE LITIGATION

### A.      Factual Background

6.      This is a securities class action brought on behalf of all persons or entities who purchased Class A and/or Class B common stock of Raytheon Company ("Raytheon" or the "Company") during the period from October 7, 1998 through October 12, 1999 inclusive (the "Class Period"), and who were damaged thereby (the "Class").[2]

---

[2]      Excluded from the Class are Defendants, all of the officers, directors and partners thereof, members of their immediate families, their legal representatives, heirs, successors, or assigns and any entity in which any of the foregoing have or had a controlling interest. Also excluded from the Class are the persons and/or entities who previously excluded themselves from the Class in

7.     During the Class Period, Raytheon was engaged in the business of providing products and services in the areas of defense and commercial electronics, business and special mission aircraft and engineering and construction.  Throughout the Class Period, PwC was a firm of certified public accountants and served as Raytheon's outside auditor.  PwC audited Raytheon's 1998 year end financial statements and issued an unqualified audit opinion dated January 26, 1999, on those financial statements, which was included in Raytheon's 1998 Form 10-K and 1998 Annual Report.

8.     As detailed below, Lead Plaintiff alleged that throughout the Class Period, the Raytheon Defendants issued or caused to be issued materially false and misleading statements and omissions which deceived the investing public as to the Company's financial performance and position by means of violations of Generally Accepted Accounting Principles ("GAAP"), which masked incurred and expected material losses at two of the Company's divisions – Raytheon Engineers & Constructors ("RE&C") and Raytheon Systems Company ("RSC") – amounting to several hundred millions of dollars which should have been written down or reserved for under GAAP, but were not.  Lead Plaintiff also alleged that throughout the Class Period, the Raytheon Defendants failed to disclose that the Company's performance on the P-3 Orion Sustained Readiness Program fixed-price contract was materially behind schedule and over-budget.

9.     Lead Plaintiff further alleged that PwC knew or recklessly disregarded these facts and, in violation of federal securities laws, knowingly or recklessly issued a materially false and misleading audit opinion which stated that Raytheon's 1998 year end financial statements were

accordance with the requirements set forth in the Notice of Pendency of Class Action dated September 13, 2002 or who excluded themselves in accordance with the requirements set forth in the Notice dated September 17, 2004.

prepared and presented in conformity with GAAP, and that PwC's audit was conducted in accordance with Generally Accepted Auditing Standards ("GAAS").

10.     Specifically, Lead Plaintiff alleged that Raytheon's financial statements and PwC's audit opinion were false and misleading because defendants knew or recklessly disregarded that: (i) RE&C had failed to write-down hundreds of millions of dollars of losses on its major contracts-in-process and certain completed contracts, including unapproved change orders and claims, where payment was not both probable and reasonably estimable; (ii) RE&C had booked tens of millions of dollars of revenue on approximately a dozen anticipated contracts – even though the contracts had not been signed, no legally binding commitments to RE&C had been made, and the contracts never financially closed – and RE&C had failed to write-off millions of dollars of unreimbursed out-of-pocket costs and non-existent profits when RE&C failed to obtain the contracts; (iii) RE&C prematurely booked revenues and profits on a number of contracts-in-process by prematurely booking costs not actually incurred and recognizing revenues and profits on such costs; (iv) RE&C project managers had assumed unrealistic and unachievable recovery plans on contracts experiencing problems, delays and cost overruns in order to understate expected losses and/or liquidated damages resulting from schedule delays and performance problems despite substantial evidence to the contrary; (v) Raytheon had failed to take material write-downs on the P-3 Orion contract which were required by no later than the start of the Class Period and violated specific GAAP prohibiting the combining of follow-on contracts in order to avoid recognizing the losses on the contract; and (vi) Raytheon's December 31, 1998 year end financial statements were materially false and misleading.

11.     On September 16, 1999, the Raytheon Defendants announced that it expected to report a charge to earnings in the range of $350 million to $450 million, pretax, in the third

quarter of 1999, including contract write-downs at RE&C.  That same day, the price of Raytheon

Class B common stock dropped $7 5/16, or 12%, to close at $53 5/8 per share, on extraordinary

trading volume of 4,572,900 shares, and the price of Raytheon Class A common stock declined

by $7 1/4 per share, or 12%, to close at $50 3/4 per share, on extraordinary trading volume of

1,818,300 shares – the largest one-day decline in the Company's stock price in at least two

decades, according to *Bloomberg News*.

      12.     On October 12, 1999, the last day of the Class Period, *The Wall Street Journal*

published an investigative article on Raytheon which reported that the Company was "over cost

or behind schedule on more than a dozen of its Pentagon fixed-price contracts."  Immediately

following the article's release, the Company contacted the New York Stock Exchange ("NYSE")

to inform it that the Company would be issuing a press release and holding a conference call

with securities analysts later that day.  Trading in Raytheon common stock was halted by the

NYSE pending release of additional information by the Company.  Thereafter, at approximately

11:31 a.m. on October 12, 1999, the Raytheon Defendants announced that the Company would

be taking total charges of $638 million pre-tax to be recorded in 1999, or $1.15 per share, plus an

additional $30 million pre-tax to be recorded in 2000 relating to RSC and RE&C.  The Company

also announced that it had reduced its earnings expectations for 1999 and 2000 as a result of

revenue shortfalls and lower-than-expected margins.  At approximately 1:00 p.m. on October 12,

1999, the Raytheon Defendants held a conference call with securities analysts, wherein

defendant Burnham stated that "execution issues" had adversely affected Raytheon's

performance, including "a number of program performance issues" in Raytheon's Aircraft

Integration Systems division (which referred to the problems and delays in the Company's P-3

Orion program).  When trading was resumed in Raytheon common stock at approximately 3:34

p.m. on October 12, 1999, the price of Raytheon Class B common stock dropped $19.50 per share, or nearly 50%, to close at $22 1/2 per share, which represented a 70% decline from the Class Period high of $73 1/2 per share on July 8, 1999.  The price of Raytheon Class A common stock similarly declined by $18.75 per share, or 44%, to close at $24 1/4 per share, which represented a 70% decline from the Class Period high of $74 15/16 per share on July 7, 1999.

**B.      History of Proceedings**

**i.      Initial filing and appointment of NYSCRF as Lead Plaintiff**

13.     Following Raytheon's October 12, 1999 disclosures, numerous securities class action lawsuits were filed against Raytheon Company, and defendants Burnham and Caine in the United States District Court for the District of Massachusetts.[3]

14.     On March 20, 2000, a hearing was held with respect to pending motions for appointment of lead plaintiff and lead counsel.  On that date, the Court issued a decision appointing NYSCRF as lead plaintiff, and the law firm of Milberg Weiss Bershad & Schulman LLP (formerly Milberg Weiss Bershad Hynes & Lerach LLP) as lead counsel.

15.     On June 12, 2000, Lead Plaintiff filed a Consolidated and Amended Class Action Complaint (the "Amended Complaint"), which asserted claims against all defendants[4] for violations of Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") and against the Individual Defendants for violations of Section 20(a) of the Exchange Act as control persons of Raytheon.

---

[3]     A securities class action was also filed in the United States District Court for the District of Maryland, which was transferred to this district by consent of all parties on January 19, 2001.

[4]     Defendants Assad, Picard, Swanson, D'Angelo, and PwC were newly named defendants in the Amended Complaint.

### ii.    The Complaint is sustained

16.    On September 8, 2000, the Raytheon Defendants and PwC filed separate motions to dismiss the Amended Complaint on the grounds that the allegations of the Amended Complaint did not satisfy the heightened pleading standards of the Private Securities Litigation Reform Act of 1995 (the "PSLRA"), including the statute's "strong inference" requirement for pleading scienter. PwC argued that the Amended Complaint failed to allege sufficient facts regarding PwC's actions or knowledge relating to its audit report on Raytheon's 1998 financial statements. The Raytheon Defendants characterized Lead Plaintiff's claims as an attack on the sufficiency and timing of an earnings charge, which they argued represented an inactionable claim of mismanagement, and not fraud.

17.    On February 9, 2001, a hearing was held with respect to the pending motions to dismiss the Amended Complaint. On August 29, 2001, the Court issued its decision denying in part and granting in part the Raytheon Defendants' motions to dismiss, and granting PwC's motion to dismiss. Specifically, the Court dismissed the Section 10(b) claim against defendant Caine, finding there were insufficient allegations to raise a strong inference of scienter on his part based on the fact that Caine did not join Raytheon until April 1999. The Court also dismissed the claims against PwC, finding that although the question was "close," facts were not alleged which raised a strong inference of scienter on PwC's part. *See In re Raytheon Sec. Litig.*, 157 F. Supp. 2d 131 (D. Mass. 2001). The Court, however, explicitly left open the possibility that during discovery concerning the pending claims against the Raytheon Defendants, an adequate factual basis might be derived for repleading sufficient allegations against PwC. *Id.*

18.    Thereafter, following extensive discovery, Lead Plaintiff filed a Second Consolidated and Amended Class Action Complaint (the "Second Amended Complaint") on March 17, 2003, renaming PwC as a defendant. On April 17, 2003, PwC moved to dismiss the

Second Amended Complaint and to strike certain portions of the Second Amended Complaint.

After full briefing on the issue, including Lead Plaintiff's motion to strike PwC's motion to

dismiss or convert it to a motion for summary judgment, and following a hearing on May 19,

2003, the Court denied PwC's motion to dismiss and motion to strike on May 21, 2003. PwC

filed both a motion for leave to file a motion for reconsideration and motion to amend certain

orders, to certify an interlocutory appeal and for a stay, which Lead Plaintiff opposed. These

motions were denied by the Court on July 1, 2003, and June 30, 2003, respectively. PwC also

filed a petition for a writ of mandamus with the First Circuit Court of Appeals on July 22, 2003,

which Lead Plaintiff opposed. The petition was denied by the First Circuit on September 24,

2003.

### iii.    Class Certification Proceedings

19.    On November 15, 2001, Lead Plaintiff served a motion, pursuant to Rule 23(a)

and (b)(3) of the Federal Rules of Civil Procedure, seeking certification of the Class, and

proposing Lead Plaintiff NYSCRF as Class representative. After obtaining discovery from

NYSCRF, including the depositions of Maurice Peaslee and William Barrett, the motion was

unopposed by the Raytheon Defendants, and by Order dated March 22, 2002, the Court certified

the Class and appointed NYSCRF as class representative.

20.    A Notice of Pendency of Class Action (the "Notice of Pendency") dated

September 13, 2002 was mailed to Class Members on or about October 11, 2002 and a summary

notice was published in the national edition of *The Wall Street Journal* on October 21, 2002.

Ninety-one requests for exclusion were received. *See* Affidavit of Jan Lipert (hereinafter the

"Lipert Aff.") at ¶¶ 2-5. The Lipert Aff. is attached hereto as Exhibit A.

### iv.    Discovery

21.    Lead Plaintiff conducted extensive discovery with respect to its claims. During

the course of discovery, Lead Plaintiff served on Raytheon and PwC combined, three sets of

document requests and six sets of interrogatories.[5]  Counsel for Lead Plaintiff engaged in

countless negotiations with defendants' counsel concerning a multitude of issues with respect to

the scope of discovery, the specific documents to be produced, assertions of the attorney-client

and work product privileges, and issues of confidentiality.

22.    During the course of the litigation, Lead Plaintiff was forced to move to compel

production of certain documents withheld by defendants on a number of occasions, which

defendants vigorously opposed. Lead Plaintiff was successful on a number of these motions,

resulting in the production of additional materials that were key to the development of its case.

23.    For example, on September 10, 2002, Magistrate Cohen ordered the Raytheon

Defendants to produce, *inter alia*, documents related to the RE&C contract write downs for the

period January 1997 through June 2000. Thereafter, on May 20, 2003, the Court granted Lead

Plaintiff's motion to enforce the September 10, 2002 discovery order.

24.    Additionally, prior to Lead Plaintiff's re-asserting a claim against PwC in its

Second Amended Complaint, PwC refused to comply with Lead Plaintiff's document subpoena

without a court order stating that no information obtained from PwC could be used against PwC

in an amended complaint. On January 22, 2002, the Court granted Lead Plaintiff's motion to

---

[5]    In addition, as part of Lead Plaintiff's initial investigation prior to the termination of the
stay of discovery mandated by the PSLRA, Lead Counsel issued numerous Freedom of
Information Act requests to various government and military entities concerning any contracts
they had entered into with Raytheon. The Raytheon Defendants had moved to stay such
discovery or to compel the disclosure of any information obtained, but the Court denied their
motion on April 11, 2000. The documents obtained proved invaluable to Lead Plaintiff's P-3
Orion related claims, which included documents that defendants never produced to Lead Plaintiff
given the more limited scope of the document productions.

compel. Thereafter, Lead Plaintiff again moved to compel PwC to comply with its initial and subsequent subpoenas, and on September 10, 2002, Magistrate Cohen ordered PwC to produce documents relating to contract write downs of RE&C for the period January 1997 through June 2000. On October 26, 2002, the Court further granted Lead Plaintiff's motion to compel PwC to produce additional documents relating to the P-3 Orion project. Subsequently, the Court granted Lead Plaintiff's motion to enforce PwC's compliance with its October 26, 2002 discovery order.

25.    Lead Plaintiff also sought to compel the production of certain documents withheld by the Raytheon Defendants on the grounds of privilege. After extensive briefing and renewed motions on the issue, going back to the end of 2002, the Court ultimately ordered Raytheon to produce certain documents, though defendants were allowed to redact certain information not pertaining to any RE&C projects or the P-3 Orion project.

26.    In total, hundreds of thousands of pages of documents were produced in response to Lead Plaintiff's requests. Over the course of literally thousands of hours of work, counsel thoroughly reviewed, coded, and categorized the documents that had been produced so that they could be reviewed and used as needed in the litigation.

27.    In addition to the massive document production and review, Lead Plaintiff conducted 30 depositions of present and former Raytheon and PwC personnel over almost a two year period. These depositions included all of the named defendants, key officers at Raytheon and PwC, former Raytheon employees, as well as senior members of PwC's audit team. Moreover, these depositions were taken in locations all around the country, including in Massachusetts, Texas, Alabama, Georgia, New York, New Jersey and California.

28.    In addition to the foregoing discovery of defendants, plaintiffs also served subpoenas upon a number of non-parties for information relevant to the claims and defenses in

11

the case, including (i) Washington Group International, Inc. ("WGI"); (ii) a number of counterparties to contracts with Raytheon, the accounting for which was at issue in this litigation, and other relevant non-parties;[6] and (iii) numerous analysts who issued research reports on Raytheon. Following negotiations with several of these non-parties over the scope of the subpoenas and issues of privilege, numerous additional documents were produced and were thoroughly reviewed by lead counsel and organized for use in prosecuting the case.

29.    During this process, Lead Plaintiff was forced to move to compel non-party WGI in federal court for the District of Idaho to produce documents pursuant to Lead Plaintiff's subpoena, in which the Raytheon Defendants moved to intervene in order to oppose the motion to compel. Because WGI purchased the assets of Raytheon's former RE&C division, it became the owner of numerous RE&C projects at issue and the custodian of scores of relevant documents. Ultimately, in January 2003, Lead Plaintiff reached an agreement with WGI whereby WGI would make available to Lead Plaintiff for inspection all of its documents relating to the projects and contracts identified in Lead Plaintiff's subpoena to WGI, and whereby any documents designated for copying by Lead Plaintiff would be produced, subject to a review by the Raytheon Defendants for responsiveness and privilege. Lead Plaintiff further agreed to bear all costs and fees incurred by WGI in the course of its production of documents. This proved to be a monumental undertaking on the part of Lead Plaintiff, as WGI made available for review *all* of the underlying contracts in its possession, which required lead counsel to review thousands of boxes of documents at WGI's warehouse in New Jersey. Lead Plaintiff also conducted a

---

[6] These counterparties included: (1) Smith Cogeneration International, Inc., (2) Agri-Technology Corp., (3) AES Corp., (4) General Electric Co., (5) Fina Oil & Chemical, (6) Worthington Industries, (7) BHP Steel Americas, (8) Gulf Chemical International Corp., (9) Acme Steel Co., (10) Deloitte Consulting, (11) Pathfinder, Inc., (12) Hoffman-La Roche Inc., (13) Indiana Harbor Coke Co., (14) Gulf Chemical Corp., (15) IMSA Coated Steel Corp., and (16) L-3 Communications Corp.

deposition of the person most knowledgeable at non-party WGI concerning its own accounting fraud litigation against Raytheon with regard to its purchase of the RE&C division from Raytheon.

30. Due to the complex accounting, auditing and damages issues presented in this case, lead counsel also worked closely with a number of highly qualified testifying and non-testifying experts in these fields. Among other things, these experts assisted lead counsel in reviewing and understanding documents produced by defendants and non-parties, evaluating Raytheon's compliance, or lack thereof, with GAAP and actuarial standards of practice, evaluating PwC's compliance, or lack thereof, with GAAS, and estimating damages.

31. In addition to obtaining discovery from defendants and non-parties, Lead Plaintiff complied with extensive discovery demands by the defendants. In this regard, Lead Plaintiff produced thousands of pages of documents, which were reviewed by lead counsel for privilege and responsiveness, and responded to multiple sets of interrogatories. Moreover, as set forth above, defendants took the depositions of William Barrett and Maurice Peaslee as representatives of Lead Plaintiff.

32. In addition to the massive merits discovery described above, extensive discovery of experts was conducted in this case. Plaintiff's four experts to testify at trial were: (1) Dr. Scott D. Hakala, who opined on plaintiff's damages; (2) Charles S. Drott, who evaluated PwC's independence and objectivity in its audit work and other professional services rendered to Raytheon; (3) Jeffrey E. Fuchs, who opined on Raytheon's compliance with GAAP, and the reasonable amount of revenue and cost Raytheon should have recognized under these requirements; and (4) Nathan J. Naddeo, who assessed the existence and impacts of accounting irregularities and inadequate financial disclosures and the attendant violations of GAAP on

Raytheon's financial statements, and assessed PwC's adherence to GAAS for their audit work. Lead Plaintiff worked closely with each of these experts to, *inter alia*, identify and provide the information and data from the massive discovery record in this case necessary to each expert's work. On December 11, 2003, each of Lead Plaintiff's experts produced a report as required by Rule 26 of the Federal Rules of Civil Procedure setting forth the opinions he intended to offer at trial.

33.     In January 2004, defendants served the Rule 26 reports of their nine testifying experts. The Raytheon Defendants retained four of the nine experts:  (1) Professor Paul A. Gompers, who examined the opinion of Lead Plaintiff's damages expert; (2) Thomas M. Blake, who evaluated the accounting allegations against Raytheon in this case; (3) Lucy P. Allen, who estimated stock price inflation assuming liability is found and evaluated the opinion of Lead Plaintiff's damages exeprt; and (4) Charles L. Wilkins, who opined on Raytheon's combination of the original P-3 Orion contract and follow-on contract for purposes of recognizing revenue, cost and profit, and on the timeliness of Raytheon's recognition of loss on the program. PwC retained five experts:  (1) Raymond Ball, who opined on Lead Plaintiff's damages expert's opinion; (2) Charles C. Cox, who opined on plaintiff's damages in this case and the opinion of Lead Plaintiff's damages expert (3) Sandra K. Johnigan, who opined on Lead Plaintiff's expert's opinion on PwC's independence as Raytheon's auditor; (4) Russell F. Agosta, who opined on PwC's audit of Raytheon's 1998 financial statements; and (5) Eugene S. Abernathy (same).

34.     In response to reciprocal demands, Lead Plaintiff's and defendants' experts collectively produced over ten thousand pages of documents and analysis in connection with their work. Lead counsel, with the assistance of their experts, reviewed and analyzed the productions of defendants' experts in preparation for depositions. Depositions of plaintiff's and

14

defendants' experts were taken over a three week period and concluded on February 7, 2004, with the depositions of defendants' nine experts occurring back-to-back over a grueling nine day time period.

**v.     Summary Judgment and Trial Preparation**

35.     On February 20, 2004, the Raytheon Defendants and PwC each filed a motion seeking summary judgment. Defendants' moving papers, which included supporting memoranda and Local Rule 56.1 statements of undisputed material facts and affidavits attaching voluminous deposition testimony and documents, were massive. Two weeks later, Lead Plaintiff served responses to each motion, which included nearly 300 exhibits and supporting statements of disputed facts, and defendants served reply briefs and further supporting affidavits. Lead Plaintiff again replied to both in its sur-reply within two weeks time. PwC also filed a lengthy motion to strike Lead Plaintiff's Local Rule 56.1 statements of material facts, which Lead Plaintiff opposed.

36.     Following a hearing held on April 8, 2004, the Court issued a decision on April 20, 2004 denying the Raytheon Defendants' motion, and a decision on April 26, 2004 denying PwC's motion.

37.     Also on April 26, 2004, the Court ruled on PwC's motion for judgment on the pleadings, which was filed in October 2003. The Court partially dismissed Lead Plaintiff's securities fraud claim against PwC to the extent it sought to assert any claim against PwC for purchases of Raytheon stock prior to March 30, 1999, and further ruled that the Court's March 22, 2002 class certification order should be modified as to PwC to limit the class period to March 30, 1999 through October 12, 1999.

38.     At the same time that Lead Plaintiff was filing its sur-replies to defendants' motions for summary judgment, pursuant to the scheduling order entered by the Court, the

parties began an intense month-long schedule of preparing and exchanging various pretrial disclosures and submissions, and their objections thereto:

- On March 26, 2004, the parties prepared and exchanged their pretrial disclosures which contained lists of both possible trial witnesses and possible trial exhibits;

- The following week, Lead Plaintiff took two additional depositions of PwC witnesses regarding certain documents recently produced to Lead Plaintiff pursuant to Court Order;

- On April 9, 2004, the parties exchanged their objections to the pretrial disclosures;

- On April 12, 2004, the parties exchanged their formal witness and exhibit lists, their proposed jury instructions, their proposed *voir dire* questions, and their deposition designations of those witnesses who would be unavailable for trial. Thereafter, lead counsel engaged in the laborious process of reviewing defendants' proposed exhibits and formulating objections, as appropriate, to authenticity and admissibility;

- On April 19, 2004, the parties submitted their objections to witness and exhibit lists, and deposition counter-designations; and

- On April 26, 2004, the parties submitted their joint pretrial memorandum.

39.     The parties also filed and briefed a total of twenty-two separate motions *in limine* (including an "omnibus" motion filed by PwC) on April 12, 2004, within two weeks of Lead Plaintiff filing its sur-reply to defendants' motions for summary judgments. Oppositions to all of these motions were filed just one week later. Specifically, the Raytheon Defendants sought by motion:

- to exclude the testimony of Lead Plaintiff's expert Hakala;

- to exclude evidence relating to insurance coverage;

- to exclude post-hoc evidence relating to RE&C;

- to limit the testimony of Lead Plaintiff's experts Fuchs and Naddeo;

- to exclude evidence relating to the Saudi Binladin Group and Osama Bin Ladin;

- to exclude evidence relating to the SEC's finding of Regulation FD violation;

- to exclude evidence relating to Dennis Kozlowski;

- to exclude the testimony of Krishnaswami Alladi; and

- to limit trial on RE&C claim to four projects written down in Q3 1999.

PwC sought by motion:

- to exclude certain evidence *via* an omnibus motion, which included (1) evidence of facts arising after the end of the class period; (2) evidence of facts arising after the date of issuance of PwC's audit report; (3) evidence pertaining to PwC non-audit services for Raytheon, other than services or contracts to render services up through the issuance of the 1998 audit report; (4) evidence pertaining to P-3 Orion or Navy Sustained Readiness Program; (5) evidence pertaining to Raytheon goodwill; and (6) evidence of facts and circumstances for which there is no foundation as to PwC's possession, knowledge or awareness of those facts and circumstances prior to or at the time of the issuance of its FY 1998 audit report.

- to exclude testimony of Lead Plaintiff's expert Naddeo;

- to exclude testimony of Lead Plaintiff's expert Fuchs;

- to sever the trial against the Raytheon Defendants from the trial against PwC;

- to exclude testimony of Lead Plaintiff's expert Drott; and

- for a two-part instruction with respect to special interrogatories.

And Lead Plaintiff sought the following by motion:

- an Order precluding defendants from offering live testimony from any witness solely for the purposes of defendants' case who are not made available to testify live during Lead Plaintiff's case-in-chief and also requesting leave to examine defendants' witnesses as hostile witnesses;

- to preclude the Raytheon Defendants from making any references related to Raytheon Company's role in national defense or national security;

- to preclude defendants from introducing or referring to evidence concerning time periods for which they have refused to produce discovery;

- to preclude the Raytheon Defendants from referring to evidence of a "comprehensive" review process or assessments by legal counsel at trial;

- for leave to conduct a limited number of trial depositions;

- to strike the testimony of Raytheon Defendants' accounting expert Blake, based on his prior consulting work with Raytheon; and

- to preclude defendants from referencing the SEC's failure to prosecute or take action against defendants.

40.     The Court issued rulings on many of these motions prior to the start of trial. Furthermore, the Court held several *Daubert* hearings as to Lead Plaintiff's damages expert in the weeks leading up to trial. A number of the foregoing motions *in limine* became moot when Lead Plaintiff and the Raytheon Defendants entered into a proposed settlement agreement on May 11, 2004. The Court ruled in a hearing on May 18, 2004, however, that Lead Plaintiff's experts may testify at trial, including Lead Plaintiff's expert on Raytheon's underlying compliance or non-compliance with GAAP.

41.     In preparation for trial, the parties held numerous discussions concerning the type of courtroom technology to be used at trial. Lead Plaintiff contracted with a third-party vendor for the provision of trial technology and trial consulting services. Lead Plaintiff entered all of its proposed trial exhibits into a computer database for display and use at trial. Lead Plaintiff also converted numerous hours of videotaped deposition testimony into a format suitable for use at trial. In conjunction with the trial technology consultants, Lead Plaintiff also prepared numerous demonstrative exhibits for use at trial.

42.     In May 2004, lead counsel also oversaw the set up of trial technology in the courtroom in conjunction with counsel for defendants. This trial technology included a large video screen for the viewing of trial exhibits, video monitors for the judge, jury, witnesses and attorneys, microphones and audio equipment, laptop computers for use by attorneys, document database management systems, and real-time trial transcription services.

43.     On May 11, 2004, Lead Plaintiff reached an agreement in principle to settle its claims against the Raytheon Defendants for $410,000,000 payable to the Class (which includes

$210 million in cash and $200 million worth of Raytheon Warrants). The settlement with the Raytheon Defendants, which came less than two weeks before the trial was scheduled to commence, required Lead Plaintiff to significantly revise its trial preparation and strategy on short notice including, *inter alia*, the order and identity of the witnesses who would be called to testify in Lead Plaintiff's case-in-chief against PwC.

44.     On May 24, 2004, 12 jurors were impaneled in Lead Plaintiff's case against PwC. On May 25, 2004, prior to the commencement of opening arguments, Lead Plaintiff and PwC reached an agreement to settle all claims against PwC.

**C.     Settlement Negotiations**

45.     Settlement discussions were held during the course of the litigation. The parties met with Judge A. David Mazzone, a federal judge in this District, in May 2002. Following this meeting, the parties requested that formal mediation be suspended and resumed after the Court had ruled on a pending motion to compel, and once discovery has been completed, in order for the parties to better evaluate the case. The parties met again with Judge Mazzone in October 2003. A confidential mediation statement was provided by both sides prior to these sessions with Judge Mazzone. In 2004, the parties had multiple mediation sessions with a retired federal judge, Judge Nicholas J. Politan. Not surprisingly, these discussions revealed that the parties held widely different views with respect to the merits of the case and the methodology for calculating damages and the amount of damages recoverable by the Class. Nevertheless, Lead Plaintiff and the defendants agreed to continue their discussions. At these sessions, the parties made presentations to the mediator with respect to their positions.

46.     Serious settlement discussions between Lead Plaintiff and the Raytheon Defendants did not resume until April 2004, following the Court's adjudication of the pending motions for summary judgment. Finally, as noted above, on May 11, 2004, less than two weeks

before trial was scheduled to commence, Lead Plaintiff and the Raytheon Defendants agreed in principle to settle Lead Plaintiff's claims against the Raytheon Defendants for $210,000,000 in cash and $200,000,000 in Settlement Warrants.

47.     Thereafter, settlement negotiations between PwC and Lead Plaintiff intensified. Finally, on May 25, 2004, the second day of trial, before commencement of opening arguments, PwC agreed to pay $50 million in settlement of Lead Plaintiff's claims.

## TERMS OF THE SETTLEMENT

48.     In full and complete settlement of the claims that have or could have been asserted against the Raytheon Defendants in this action, and subject to the terms and conditions of the settlement agreement, the Raytheon Defendants have (i) paid into escrow the cash sum of $210,000,000, which has been earning interest for the benefit of the Class, and has accrued $603,125.44 in interest as of November 15, 2004 (the "Raytheon Gross Cash Settlement Fund"); and (ii) will deliver $200 million worth of Settlement Warrants for the benefit of the Class (the "Raytheon Gross Settlement Warrants") pursuant to a Black-Scholes calculation as of the time of distribution.

49.     In full and complete settlement of the claims that have or could have been asserted against PwC in this action, and subject to the terms and conditions of the settlement agreement, PwC has paid into escrow the cash sum of $50,000,000, which has been earning interest for the benefit of the Class, and has accrued $209,657.87 in interest as of November 15, 2004 (the "PwC Gross Settlement Fund").

50.     The Raytheon Gross Cash Settlement Fund, the Raytheon Gross Settlement Warrants, and the PwC Gross Settlement Fund, less all taxes, approved costs, fees and expenses (the "Net Raytheon Settlement Fund" and the "Net PwC Settlement Fund") shall be distributed on a *pro rata* basis, as described in the Plan of Allocation discussed below, to members of the

20

Class who submit timely and valid Proofs of Claim. Class members have until December 31, 2004 to file valid and timely proofs of claim in order to participate in the Settlements.

51. Upon the Court's approval of the Settlements, Lead Plaintiff and members of the Class will release, and shall be enjoined from prosecuting, defendants and related parties for all claims that were or could have been asserted in the litigation.

## THE PLAN OF ALLOCATION

52. The proposed Plan of Allocation (the "Plan"), as set forth in the Notice mailed to the members of the Class beginning at page 10, reflects Lead Plaintiff's evaluation of the strengths and weaknesses of the claims of Class members. The Plan of Allocation was extensively reviewed by Lead Plaintiff, who approved its terms. Each claimant's *pro rata* share of the Raytheon Net Settlement Fund and the PwC Net Settlement Fund shall be based upon the claimant's Recognized Claim from transactions during the Class Period.

53. The Plan and the "Recognized Claim" formulae were prepared in such a way as to fairly allocate the recovery among Class Members in accordance with Lead Plaintiff's theories of damages in the action. Thus, as set forth in detail in the Plan, with respect to Class A and Class B common stock purchases, a claimant's Recognized Claim is based upon Lead Plaintiff's contention of the estimated artificial inflation in the price paid for shares of Raytheon Class A and Class B common stock. This estimated inflation is the excess amount that Class Members allegedly paid, over fair market value, for their securities. To the extent that a Class Member sold the securities at a still inflated price, the Recognized Claim is reduced under the Plan. The alleged amount of artificial inflation for each security and for each day during the Class Period are set forth in the Notice mailed to the members of the Class. The formulae take into account the limitations on damages imposed under the PSLRA. The Claims Administrator shall

21

determine each Claimant's "Recognized Claim"[7] based upon the information supplied with the person's proof of claim.

## EVALUATION OF THE PROPOSED SETTLEMENT

54.     The Settlements are the result of more than four years of hard-fought litigation and extensive arm's length negotiations between experienced counsel, with the active and direct involvement of Lead Plaintiff, who have concluded that the Settlements are fair, reasonable and adequate and should be approved by the Court.  Settlement at this time avoids the significant risks and costs of trial and subsequent appellate proceedings, which could have delayed final resolution of these claims for years.  The Settlements provide an immediate benefit to the Class – one of the ten largest recoveries ever in a securities class action case.  It is the informed opinion of lead counsel that the significant risks involved in taking this case to trial justify these Settlements.

55.     The pertinent factors for evaluating the fairness of a proposed class action settlement are the following:  (1) the potentially significant obstacles to a recovery; (2) the complexity and likely duration of the litigation; (3) the stage of the proceedings at which the settlement was reached; (4) the amount of the settlement in light of the risks of litigation; (5) whether the settlement was reached after arm's length negotiations and the opinion of qualified counsel; and (6) the reaction of the class to the proposed settlement.

56.     A proposed class action settlement enjoys a strong presumption that it is fair, reasonable and adequate if, as is the case here, it was the product of arm's-length negotiations conducted by capable counsel, well-experienced in class action litigation arising under the federal securities laws.  Moreover, under the PSLRA, a settlement reached under the supervision

---

[7]     There is no Recognized Claim from any transaction resulting in a gain.  Purchases and sales will be matched on a first-in, first-out ("FIFO") basis.

of an appropriately selected Lead Plaintiff is entitled to an even greater presumption of reasonableness. As stated in the Senate Committee Report issued in support of the PSLRA, as cited in *Greebel v. FTP Software, Inc.*, 939 F. Supp. 57, 63-64 (D. Mass. 1996): "Institutions with large stakes in class action share much the same interests as the plaintiff class generally; thus, courts could be more confident settlements negotiated under the supervision of institutional plaintiffs were 'fair and reasonable' ..." Absent fraud or collusion, the court should be hesitant to substitute its judgment for that of the parties who negotiated the settlement. Based on an analysis of these factors, I believe that the settlements before the Court are fair, reasonable and adequate and should be approved.

57. Although Lead Plaintiff and counsel believe that they have a strong case on the merits, they are aware that there were very difficult issues of law and fact that made a trial of Lead Plaintiff's claims a risky and uncertain proposition.

**A.     The Potentially Significant Obstacles to a Recovery**

58. There were significant risks in proceeding with a trial of Lead Plaintiff's claims. Throughout the litigation, defendants vigorously contested issues of liability and damages and advanced arguments that, while unsuccessful at the motion to dismiss and summary judgment stage, might have persuaded a jury to find in their favor. Lead Plaintiff's claims that Raytheon's financial statements were materially misstated required the jury to understand and consider complex accounting standards and calculations and each of the parties had retained experts to testify with respect to these issues.

59. Lead Plaintiff had the burden of persuading the jury that Raytheon's misstated financial results were fraudulently issued and that the Company's Q3 1999 special charges for the RE&C projects were not simply a result of new cost growth associated with sudden and unforeseen events that occurred in 1999. Although Lead Plaintiff believed that there was strong

evidence to support its claim that the Raytheon Defendants knew by the start of the Class Period that they needed to write down in excess of $600 million on problem RE&C projects, such as the "Actionable Asset Memorandum" prepared by Gregory Flick, a long-term RE&C management-level employee with extensive accounting experience, the Raytheon Defendants vigorously disputed that these facts were evidence of fraud. Moreover, PwC argued that there was no evidence that it was even aware of the Flick memo. The Raytheon Defendants also argued that Lead Plaintiff could not prove the required element of scienter in light of Raytheon's good faith reliance based on their contention that PwC had approved their accounting treatment for the P-3 Orion project on several occasions.

60.    Experts retained by the Raytheon Defendants and PwC maintained that Raytheon's financial statements and the audit of those financial statements complied with all applicable accounting and auditing standards of practice. Although Lead Plaintiff's accounting and auditing experts testified to the contrary and Lead Plaintiff believed there was substantial evidence supporting the testimony of its experts, the contradictory testimony of multiple defense experts with respect to such a complex subject matter might have persuaded a jury that defendants did not engage in reckless or knowing misconduct, and that Raytheon's financial statements had been calculated and reported in good faith.

61.    Further, PwC was prepared to offer the testimony of accounting and auditing experts with industry experience, one of whom even helped draft one of the GAAP regulations that Lead Plaintiff alleged to have been violated here, in support of its contention that its audit of these aspects of Raytheon's 1998 financial statements was performed in accordance with GAAS. In the resulting "battle of experts" there was no telling whether the jury would have been

persuaded that Raytheon's financial statements had been fraudulently misstated during the Class Period as Lead Plaintiff alleged.

62.     Lead Plaintiff also faced significant hurdles in demonstrating loss causation and damages.  While the market's reaction to Raytheon's September 16, 1999 and October 12, 1999 announcements had been dramatic, defendants and their experts maintained that the resulting market decline could not be attributable to any alleged fraud.  For example, PwC argued that there was no evidence that these announcements revealed any misstatements in PwC's 1998 audit report.  Similarly, the Raytheon Defendants argued that the alleged losses of Lead Plaintiff and the Class were caused by sudden and unforeseen events, such as labor unrest, damaged equipment, a subcontractor walking off a job, and a project manager suppressing cost and other data, and that Lead Plaintiff could not prove that such losses were caused instead by any alleged fraud.

63.     Finally, had the lawsuit proceeded through trial, Lead Plaintiff's case-in-chief would have been hampered by the fact that its case would have primarily been proven through the testimony of employees of defendants Raytheon and PwC.  Such witnesses would have been hostile to Lead Plaintiff's case while testifying.

64.     In sum, trial of this case presented substantial risks with respect to establishing liability and damages.  When measured against the substantial $460,000,000 Settlements obtained, the foregoing risks strongly favored settlement of this action.

**B.      The Complexity, Expense and Likely
         Duration of the Litigation**

65.     As the preceding paragraphs have shown, this action is replete with complexity both in establishing liability and in proving damages.  Trial of these claims, which was expected to last six weeks or more, would have required substantial additional time and resources.

Moreover, whatever the outcome of the trial, likely appeals would have been taken to the First

Circuit and perhaps even to the U.S. Supreme Court. All of the foregoing would have delayed,

for years, the ability of the Class to recover. Settlement at this juncture results in a substantial

and tangible present recovery, without the attendant risk and delay of trial and post-trial

proceedings.

**C.     The Stage Of The Proceedings And The Amount Of Discovery Completed**

66.     Having prosecuted this case to the very eve of trial, Lead Plaintiff and Lead

Counsel are well informed of the strengths and weaknesses of its claims and defendants'

defenses. Thus, Lead Plaintiff and Lead Counsel have the information necessary to evaluate the

relative merits of each side's case with respect to both liability and damages.

**D.     The Range Of Reasonableness Of The Settlement In Light Of The Likely Recovery
         And All The Attendant Risks Of Litigation**

67.     These Settlements in total represent one of the ten largest securities class action

recoveries in a single case. As noted above, issues concerning the amount of and methodology

for calculating damages in this case were vigorously disputed by the parties, and were a

particular focus of attention in the weeks leading up to trial. Defendants unsuccessfully moved

to exclude the testimony of Lead Plaintiff's damages expert under *Daubert*.

68.     The proposed Settlements are excellent recoveries for the Class relative to the

estimate of total damages in this case. In addition, the recovery of $50 million from PwC is an

outstanding result given the difficulty that Lead Plaintiff would have faced at trial in obtaining a

sufficient aggregate jury award that would provide for an additional recovery for the Class

following the required offset of the Raytheon Defendants' $410 million settlement.

69.     In view of the foregoing, and in light of all the risks, the Settlements represent an

outstanding recovery for the Class.

**E.     The Settlement Was Reached After Arm's Length Negotiations**

70.     When a proposed settlement is the result of arm's length negotiations among experienced counsel and parties, there is an initial presumption that the proposed settlement is fair and reasonable.  Collusion is not an issue with respect to these Settlements.  As explained herein, the parties fought hard over the course of more than four years of litigation, took over 40 depositions, filed numerous motions and fully prepared for trial.  The parties continued negotiation of the settlement with the Raytheon Defendants until just days before the trial and with PwC until literally moments before the opening arguments were about to begin.  The settlement negotiations themselves were intense, hard-fought and conducted at arm's length between experienced and skilled attorneys, with the assistance of both a sitting federal judge and retired federal judge, and the active involvement and approval of the Lead Plaintiff.  Qualified and experienced counsel for both sides, who are intimately familiar with all facets of this case, and Lead Plaintiff, recommend final approval of the Settlements.  The Settlements are therefore clearly entitled to a presumption of fairness based on the negotiations.

**F.     The Reaction Of The Class To The Settlements**

71.     Notice of the proposed Settlements, in substantially the form approved by the Court, was mailed to more than 180,000 Class Members on or about September 17, 2004, and published in the national edition of *The Wall Street Journal* on September 21, 2004.  *See* Affidavit of Richard W. Simmons Re: (A) Mailing of Settlement Notice and Claim Form; and (B) Report on Exclusion Requests Received ("Simmons Aff.") at ¶¶ 4-6, attached hereto as Exhibit B; and Affidavit of Mike Henley, attached hereto as Exhibit C.  Class Members had until November 9, 2004 to object to the Settlement.  To date, even though over 180,000 notices have been mailed to members of the Class, only two objections to the Settlements have been received from non-Class members, and no member of the Class has objected on any ground.  The absence

27

of any objections from any of the extraordinarily large number of potential Class Members (including numerous sophisticated financial institutions) who received notice in this case is further grounds for finding that the Settlements are fair, reasonable and adequate and should be approved by the Court.

72.     Because neither of the objectors are members of the Class, they do not have standing to object to these Settlements.  Roman Lubinecky's objection is premised solely on the fact that he is not a member of the Class.  Mr. Lubinecky purchased Raytheon stock in 1997, well before the start of the Class Period and before any of the defendants are alleged to have issued any false and misleading statements, and as such, his objection is without merit and he lacks standing to assert both a claim in this action and an objection to the Settlements.

73.     The second objection comes from the State of New Mexico Taxation and Revenue Department (the "NMTRD") in its purported capacity as unclaimed property custodian of shares of Raytheon stock.  The NMTRD does not claim to be a member of the Class, nor has it established that it is the unclaimed property custodian of any Raytheon shares purchased during the Class Period.  Further, the NMTRD does not assert, nor could it assert, a direct claim to the Settlement funds in its purported capacity as custodian of unclaimed property under the New Mexico unclaimed property statute (New Mexico Unclaimed Property Act § 7-8A-1 et seq.).  Consequently, the NMTRD has not established that it has standing to object to the terms of the Settlements.  Although the NMTRD claims to bring its objection in its capacity as unclaimed property custodian of shares of Raytheon stock, it clearly has no direct pecuniary interest in the Settlement funds proceeds that, under the proposed Plan of Allocation, would go to eligible Class members.  The proposed Plan of Allocation allows the Authorized Claimants to receive the largest possible economic distribution from the settlement while minimizing administration and

tax costs. It provides a rational economic criteria for one proportional redistribution of any amounts earned in, or returned to, the fund after the initial pro rata distribution, with any remainder thereafter to be disposed of to charity. Such provisions have become fairly common for dealing with pro rata distributions to a large number of class action claimants.

74.     The NMTRD first contends that the provision of the Settlements that allows the residuum of the settlement fund to be distributed to a charity of lead counsel's choosing is an unconstitutional "taking" that the Court is not authorized to approve. This objection is premised on the NMTRD's erroneous assumption that Class members have an unconditional right to share in the settlement proceeds. This is not the case, as Class members are required to perform a number of steps before they have a vested legal right to any portion of the settlement fund, the last of which is that the Class Member must actually cash the award. By approving this claims process, the Court would not be ordering a "taking" of property that is prohibited by the Fifth Amendment. Rather, it would be carrying out its prescribed role under Fed. R. Civ. P. 23(e) of assessing the fairness and reasonableness of the Settlements, including the most efficient method of distributing and re-distributing settlement proceeds among Class members pursuant to the terms agreed to by the parties to the litigation.

75.     The NMTRD next contends that the Court lacks jurisdiction under Article III to enter an order that would allow the residuum of the Settlements to be distributed to a charity because doing so purportedly would place the Court in "the role of a philanthropist in distributing other people's money." NMTRD Objection at 2. However, it is well recognized that the doctrine of *cy pres* and courts' broad equitable powers permit the use of unclaimed settlement funds by educational, charitable, and other public service organizations for other public interest purposes. By approving the Plan of Allocation, including its provision regarding

how the residuum will be distributed, the Court will be carrying out its proper adjudicative function. Numerous courts have approved similar provisions in plans of allocation that allow residual amounts remaining in a settlement fund to be distributed to a charity.

76.    Significantly, the proposed Plan of Allocation has been sent to all Class Members and no objections have been received from Class Members as to the Plan. Therefore, in approving the Plan of Allocation, the Court will be acting in accordance with the favorable reaction of the Class.

77.    The NMTRD also contends that the issuance of warrants to fund a portion of the Raytheon Settlement is improper because *it dilutes the value of the common stock* held by all Raytheon shareholders. However, the NMTRD offers no cogent reason why a settlement that includes the issuance of stock in addition to a cash payment is any more or less objectionable than a cash-only settlement. Carried to its logical end, the NMTRD's objection would lead to the conclusion that no class action settlement could be approved, regardless of whether the settlement is for cash or stock, and ignores the fact that a settlement provides not only recovery for injured class members who may or may not continue to hold stock, but additional long term benefits to the corporation and its stockholders. In fact, NMTRD's objection would prevent a corporation from issuing new stock or related securities under any circumstances. Contrary to the NMTRD's assertion, there is nothing improper about this aspect of the Raytheon Settlement.

78.    As set forth more fully in Lead Plaintiff's Memorandum of Law in Support of Final Approval of Class Action Settlements and Plan of Allocation, filed herewith, these objections are without merit and should be rejected.

## THE FEE PETITION

### A.   The Requested Fee Is Reasonable Under Both The Percentage And Lodestar/Multiplier Methods

79.     Pursuant to a written retainer agreement with Lead Plaintiff entered into on December 10, 1999, lead counsel request a fee of nine percent of the Settlements, including interest earned thereon from the date of inception of the Funds through the date of payment. The requested fee will be paid to counsel in cash and warrants in the same proportion as made available to Class members in the Settlements. The percentage sought is more than merited in this case in light of the excellent results obtained, and significantly higher percentages have been awarded in numerous securities class actions that have not been as intensely litigated. As set forth in the memorandum of law submitted in support of Lead Plaintiff's counsel's fee application, the First Circuit and other circuits have held that the simple and direct percentage method of computing fees, which is supported by the PSLRA,[8] is available to this Court in awarding fees in common fund cases. However, if the Court elects to also consider the lodestar/multiplier method in awarding counsel's fees, the appropriate information is presented herein and also supports the requested fee award. (It should be noted that the lodestar figures do not include the time which plaintiffs' attorneys have expended in preparing the Fee Application.)

80.     The cumulative lodestar for the services performed by all of the plaintiffs' firms in this action is $13,160,578.00. The requested fee, amounting to $41,400,000 plus interest, represents a multiple of approximately 3.14 times the lodestar. The Compendium of Plaintiffs' Counsel's Affidavits In Support of An Award Of Attorneys' Fees and Reimbursement of

---

[8]     The PSLRA, 15 U.S.C. § 78u-4(a)(6), provides: "Total attorneys' fees and expenses awarded by the court to counsel for the plaintiff class shall not exceed a *reasonable percentage* of the amount of any damages and prejudgment interest actually paid to the class...." (Emphasis added.)

Expenses (the "Compendium"), which is being filed contemporaneously with this declaration, contains individual affidavits for each of the firms that worked on this case, setting forth the names of the lawyers of each firm who worked on the litigation, the normal hourly rates currently chargeable by each lawyer, the lodestar value of the time expended by attorneys and paralegals and the expenses of each firm and the background and experience of each petitioning firm.

81.    The requested fee is within the amount set forth in the Notice. The Notice mailed to Class members discloses that plaintiff's counsel "are moving the Court to award attorneys' fees from the Settlement Funds in the amount of nine percent (9%) of each of the Gross Cash Settlement Funds and Settlement Warrants," and for reimbursement from the Gross Cash Settlement Funds of their reasonable expenses up to a maximum amount of $8,250,000, plus interest on such expenses at the same rate as earned by the Gross Cash Settlement Funds. Pursuant to this Court's Order, all objections to the application for fees and reimbursement of expenses had to be served and filed no later than November 9, 2004. To date, there have been no objections concerning the fee award. The absence of objections to the fee request is especially noteworthy in this case since the Class includes a significant number of large, sophisticated institutional investors who collectively purchased a substantial percentage of the damaged Raytheon shares of common stock during the Class Period.

**B.    The Results Obtained From Counsel's Efforts,
And The Quality Of The Work Performed**

82.    My firm, which acted as lead counsel for Lead Plaintiff and the Class, has great experience in complex federal civil litigation, particularly the litigation of securities and other class actions, and has achieved significant acclaim for its work. My firm's experience in the field allowed us to identify the complex issues involved in this case and to formulate strategies to

prosecute it effectively. Our reputation as attorneys able and unafraid to carry a meritorious case through the trial and appellate levels, gave us strong leverage in the settlement negotiations with defendants.

83.     The team of attorneys who prosecuted this case and was prepared to try it was led by Jared Specthrie, Salvatore J. Graziano and Charles S. Hellman, all highly experienced and respected securities lawyers. Mr. Specthrie has extensive trial experience in complex securities cases among other cases: he was lead counsel in another securities fraud class action jury trial in this District, *In re Viatron*, MDL 138 (D. Mass.), and he represented the Federal Deposit Insurance Corp. in a year-long trial to recover banking losses arising out of the failure of the Butcher brothers' Tennessee banking empire. The FDIC ultimately settled for $425 million after a full jury trial as part of a global settlement among the FDIC and defendant Ernst & Whinney. Mr. Specthrie also represented the City of San Jose in a six-month jury trial in federal court for the Northern District of California against thirteen brokerage firms and an accounting firm involving losses to the City as a result of speculative, leveraged bond trading, which resulted in a verdict for the City against defendants totaling over $18 million plus pre-judgment interest.

84.     The settlement negotiations in this case were led by Melvyn I. Weiss, a founding member of my firm and a recognized leader in the securities class action bar. Mr. Weiss has over 30 years experience litigating complex securities class actions, and is considered a leading authority on shareholder and consumer rights.

85.     This action was prosecuted with the utmost efficiency given its length and complexity, and defendants' vigorous opposition. The extraordinary settlement obtained illustrates the competence and abilities of lead counsel.

86.    The Settlements are an excellent result for the Class.  The quality of the work performed is reflected in the fact that Lead Plaintiff was able to obtain a $460,000,000 Settlement even though trial might have resulted in a finding on liability or damages for the defendants.  As described above, there was no guarantee that Lead Plaintiff would have succeeded in convincing a jury that Raytheon's financial results were materially and fraudulently misstated, that PwC's audit opinion was fraudulently issued, or that the damages were what Lead Plaintiff claimed them to be.

87.    The overwhelmingly positive reaction, to date, of the Class is another testament to the quality of the Settlements and the merits of plaintiff's counsel's fee application.

**C.    The Risks Undertaken By Counsel In Pursuing This Case**

88.    As shown in the accompanying memorandum of law, determination of a fair fee must include consideration of the contingent nature of counsel's retainer and of the extent of the difficulties and uncertainties which were overcome in obtaining the Settlements.

89.    Here, counsel agreed to prosecute this case on an entirely contingent fee basis. My firm received no retaining fees from our client.  Counsel knew from the outset that they might expend many millions of dollars worth of attorneys' time and out-of-pocket expenditures in pursuing this action on behalf of the Class, yet receive no compensation whatsoever if the action ultimately proved unsuccessful.  In addition, contingent fee litigation also carries the risk that, even if successful, the Class might receive an amount smaller than needed to provide a fully compensatory fee to counsel.  Professionals in the firms representing the Class collectively expended over 40,972 hours with no assurance of success.  Counsel was also unassisted by any government investigation or prosecution in reaching the Settlements.

90.     This declaration and the memoranda in support of the proposed Settlements and the fee application describe the substantial risks of litigation. Those same difficulties also constituted risks that counsel might never be paid for their efforts.

**D.     Risks Of Contingent-Fee Litigation Generally**

91.     There are numerous cases where plaintiffs' counsel in contingent-fee cases such as this, after expenditures of thousands of hours and significant out-of-pocket expenditures, have received no compensation whatsoever. It is unfortunate, but true, that plaintiffs' counsel who litigate cases in good faith and receive no fees whatsoever are often the most diligent members of the plaintiffs' bar. The fact that defendants and their counsel know that the leading members of the plaintiffs' bar are actually able to, and will, go to trial gives rise to meaningful settlements in actions such as this. The losses suffered by plaintiffs' counsel in other actions where insubstantial settlement offers are rejected, and plaintiffs' counsel ultimately receive little or no fee, should not be ignored.

92.     Lead counsel knows from personal experience that despite the most vigorous and competent of efforts, attorneys' success in contingent litigation, such as this, is never assured.

93.     Plaintiffs' law firms have suffered several major defeats after years of litigation and trial, where they expended millions of dollars of time and received no compensation at all. For example, lead counsel lost a large securities fraud class action judgment in *Robbins v. Koger Props.*, Inc., 116 F.3d 1441 (11th Cir. 1997), when the Court of Appeals reversed a jury verdict of $81 million against an accounting firm after a 19-day trial in Jacksonville, Florida. The Court of Appeals reversed on loss causation grounds and entered judgment for the defendant without the opportunity for a new trial. Other such cases lost on or after trial include *In re Health Management, Inc. Sec. Litig.*, No. 96-CV-889 (ADS) (E.D.N.Y. 1999) (jury verdict for auditor in securities case); *In re Biogen Sec. Litig.*, No. 94-12177-PBS (D. Mass. 1999) (jury verdict for

35

defendants); *Bentley v. Legent Corp.*, 849 F. Supp. 429 (E.D. Va. 1994), *aff'd sub nom, Herman v. Legent Corp.*, 50 F.3d 6 (4th Cir. 1995) (directed verdict in favor of defendants after plaintiffs' presentation of its case to the jury).

94.    An example of how risky, and indeed difficult, this type of litigation is, also is exemplified by the history of *Backman v. Polaroid Corp.*, 910 F.2d 10 (1st Cir. 1990). In that case, after 11 years of litigation, a jury verdict in the plaintiffs' favor and a First Circuit decision sustaining the plaintiffs' cause of action, the plaintiffs' case was dismissed in an en banc decision and the plaintiffs recovered nothing.

95.    Many other cases are lost on summary judgment after thousands of hours have been invested in successfully opposing motions to dismiss and pursuing discovery. *E.g.*, *Freedman v. Value Health, Inc.*, 34 Fed. Appx. 408 (2d Cir. 2002) (affirming district court's decision granting defendants' motion for summary judgment); *Eisenstadt v. Centel Corp.*, 113 F.3d 738 (7th Cir. 1997) (same); *Searls v. Glasser*, No. 91 C 6796, 1994 U.S. Dist. LEXIS 13509 (N.D. Ill. Sept. 21, 1994), *aff'd*, 64 F.3d 1061 (7th Cir. 1995) (same); *In re Clorox Co. Sec. Litig.*, 238 F. Supp. 2d 1139 (N.D. Cal. 2002) (granting summary judgment in favor of defendants); *In re Convergent Techs. Sec. Litig.*, 721 F. Supp. 1133 (N.D. Cal. 1988) (summary judgment against plaintiffs following five years of litigation), *aff'd*, No. 90-15156, 1991 U.S. App. LEXIS 19733 (9th Cir. Aug. 27, 1991), *amended*, 948 F.2d 507 (9th Cir. 1991).

96.    The risks of contingent litigation also are highlighted by the fact that a dramatic change in the law can result in the dismissal of a claim after a great deal of time and effort have been expended on the case. For example, a few years ago the United States Supreme Court eliminated a cause of action for aiding and abetting under Section 10(b) of the Securities Exchange Act of 1934. *Central Bank, N.A. v. First Interstate Bank, N.A.*, 511 U.S. 164 (1994).

As a result, many courts then dismissed long pending cases that otherwise stated a proper cause of action at the time they were brought.

97. Clearly, there is no truth to the argument that a large fee is guaranteed by virtue of the commencement of a class action. It takes hard and diligent work by skilled counsel to develop facts and theories which will persuade defendants to enter into serious settlement negotiations, or alternatively, which will succeed at trial.

98. Because the fee to be awarded in this matter is entirely contingent, the only certainty from the outset was that there would be no fee without a successful result, and that such a result would be realized only after a lengthy and difficult effort.

99. Plaintiff's counsel have the option available to them of devoting more time to cases where they would be paid by clients on an hourly basis. For example, over the last several years, Milberg Weiss has represented IBM, CBS, Inc., the Federal Deposit Insurance Corporation and the City of San Jose, among others, and each of these clients paid the firm's standard hourly rates. The time devoted to a contingent fee case like this one could otherwise be spent on behalf of clients who would guarantee a steady stream of income, thereby depriving persons such as members of the Class of any meaningful opportunity to seek redress for their losses.

100. Courts have repeatedly held that it is in the public interest to have experienced and able counsel enforce the securities laws and regulations. The SEC, a vital but understaffed government agency, does not have the budget or staffing to ensure complete enforcement of the securities laws. If this important public policy is to be carried out, the courts should award fees which will adequately compensate plaintiffs' counsel, taking into account the enormous risks undertaken with a clear view of the economics of the situation.

### E.    Standing And Expertise Of Plaintiff's Counsel

101.    The expertise and experience of counsel is another important factor in setting a

fair fee. The expertise and experience of plaintiff's counsel in this case is set forth in the

individual affidavits comprising the Compendium. Plaintiff's counsel are experienced and

skilled practitioners in the securities litigation field, responsible for numerous significant

settlements as well as legal decisions that enable litigation such as this to be successfully

prosecuted.

### F.    Standing And Caliber Of Opposition Counsel

102.    The quality of the work performed by counsel for the plaintiffs in attaining the

Settlements may also be evaluated, in part, in light of the quality of the opposition. Hale and

Dorr LLP, Kirkland & Ellis LLP, and Foley Hoag LLP, counsel for the defendants, are skilled

and experienced in defending actions such as these, and senior litigation partners headed teams

from each of these firms in vigorously defending against this action. Lead counsel were thus

confronted with formidable opposition.

103.    The caliber of the legal work performed by the defense attorneys was superior. In

the face of this formidable opposition, Lead Plaintiff was able to develop its case sufficiently to

press defendants into a substantial settlement of this action. The Settlements clearly reflect

defendants' awareness of class counsel's ability and readiness to go to trial if a fair settlement

could not be achieved.

### G.    Plaintiff's Counsel Should Be Reimbursed For The Expenses They Have Incurred

104.    The reimbursement of expenses to counsel who create a common fund is

appropriate. Plaintiff's counsel have incurred unreimbursed expenses in the amount of

$6,992,407.22 for which they seek reimbursement. Such expenses were essential to the

successful prosecution and resolution of this action. A breakdown of the aggregate expenses

incurred by category is contained in the Compendium. Much of this amount was expended for photocopying, court reporting services, professional fees paid to plaintiff's experts and consultants, and expenses incurred in preparation for trial, including hotel accommodations and work space in Boston, jury and graphics consultants, and trial technology. These expenses have been carefully reviewed and audited over several weeks in great detail by representatives of Lead Plaintiff – who have been actively involved in every aspect of this case – in order to ensure their reasonableness. The expenses sought herein include only those expenses agreed to by Lead Plaintiff after taking into account certain limitations requested by Lead Plaintiff.

105.    Plaintiff's counsel seek interest on their incurred, unreimbursed expenses at the same rate as earned by the Settlement Funds from the date the Funds were established through the date of payment. The Notice mailed to Class members states that plaintiff's counsel intended to apply for reimbursement of their actual, out-of-pocket expenses up to a maximum amount of $8,250,000, plus interest at the same rate as earned by the Settlement Funds. No objection has been raised to date as to plaintiff's counsel's request for reimbursement of expenses and interest thereon and the expenses sought herein are significantly less than the maximum amount set forth in the Notice.

106.    In light of the complex nature of these actions, the expenses incurred by plaintiff's counsel are reasonable and necessary and were reasonably related to the pursuit of the interests of the Class. Accordingly, plaintiff's counsel should be reimbursed for their expenses incurred in connection with this action.

**H.    Other Expenses**

107.    Pursuant to 15 U.S.C. §78u-4(a)(4), the NYSCRF also seeks $2,664.87 of reimbursement for actual travel expenses in connection with this litigation. *See* Declaration of Alan P. Lebowitz, attached hereto as Exhibit D.

108.    In addition, we have been requested to seek reimbursement of $24,866.25 of expenses on behalf of Walter P. Crye, a non-party witness who was deposed in this action, for his actual expenses in retaining his own attorney to represent him during his deposition. *See* Affidavit of Gregory Morris, attached to the Compendium filed herewith.

## CONCLUSION

109.    In view of the very substantial cash and warrant benefit conferred on the Class, the risks of this litigation, the enormous effort of counsel, the quality of the work performed, the contingent nature of the fee, the complexity of the case, and the standing of plaintiff's counsel at the Bar, it is respectfully submitted that the Settlements of $460,000,000, plus interest, should be approved as fair, reasonable and adequate; that the Plan of Allocation be approved; and that a fee in the amount of 9% of the Gross Settlement Funds (including interest) should be awarded to counsel in the same proportion of cash and warrants as made available to the Class, together with reimbursement of expenses in the amount of $6,992,407.22 for counsel and $2,664.87 for Lead Plaintiff, with interest at the same set rate as earned by the Settlement Funds from their inception through the date of payment, with the award of attorneys' fees to be allocated among plaintiff's counsel in a fashion which, in the opinion of plaintiff's lead counsel, fairly compensates plaintiff's counsel for their respective contributions in the prosecution of the action.

I declare under penalty of perjury that the foregoing is true and correct.

Salvatore J. Graziano